IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Argued on Briefs July 8, 2014

**VERNON MOTLEY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 09-06801    Honorable Lee V. Coffee, Judge**

_____

**No. W2013-01185-CCA-R3-PC  - Filed October 3, 2014**

_____

The Petitioner, Vernon Motley, appeals the Shelby County Criminal Court's denial of post-conviction relief from his conviction for first degree premeditated murder and his sentence of life imprisonment.  On appeal, he argues that the State's <u>Brady</u> violation rendered counsels' assistance ineffective. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., and ROBERT L. HOLLOWAY, JR., SP. J., joined.

R. Todd Mosley (on appeal) and James P. DeRossitt, IV (at hearing), Memphis, Tennessee, for the Appellant, Vernon Motley.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Leslie Rainey, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Facts.**  This court summarized the evidence presented at trial in its opinion on direct appeal:

> The [Petitioner] was charged with first degree premeditated murder after the mother of his child's new boyfriend and father-to-be of her baby, Eric Deon Brown, the victim, was shot and killed outside a home at 2164 Hubert Circle in Memphis.

At trial, Tyrone Jackson, the victim's brother, identified photographs of the victim for the record.

Kendrick Buckley testified that he visited his cousin, Shaka Jones, on February 22, 2008 at the home of Jones's grandmother on Hubert Circle. The two went to get pizza and then sat across the street from Jones's grandmother's house in Buckley's truck, talking. While they were sitting in the truck, the [Petitioner] pulled up in front of the house, and "about that time [Jones] was telling [him] to pull off" or leave. As he was leaving, Buckley saw the [Petitioner] get out of his car and walk up to the porch of Jones's grandmother's house. Buckley drove to his house approximately thirty minutes away. As he was driving, Jones received calls on her cell phone, which made her "upset, real excited, real upset. Constantly hollering and screaming." He recalled that Jones was exclaiming that the victim had been shot. The next day, the police had Buckley view a photographic array from which he identified the [Petitioner] as the man he saw "walk up to the porch [at Hubert Circle]."

Shaka Jones testified that she and the [Petitioner] were involved in an "off and on" relationship for fourteen years and had a child together. Their relationship ended and, in the latter part of 2007, Jones began dating the victim. She was pregnant with the victim's baby on February 22, 2008. The [Petitioner] was not happy about Jones's pregnancy and had threatened "to kill [her], [her] baby, [the victim] and [Jones's] other kids." Jones had not told the [Petitioner] that the victim was the father of her unborn baby, but she "guess[ed] he took it upon himself to assume that's who the baby's daddy was" because of his having observed the two together and conducting his own investigation.

Jones testified that, on January 19, 2008, her and the [Petitioner]'s almost twelve-year[-]old son, "Lil Vernon," called from his visit with the [Petitioner] and "told [her] that [she] needed to bring him all of his belongings . . . because [the Petitioner] was taking him and [she] wasn't going to get him back[.]" "Lil Vernon" also relayed that the [Petitioner] threatened to kill him, Jones, and Jones's other son if Jones did not comply. Jones eventually sought help from the [Petitioner]'s mother who was able to get "Lil Vernon" back. After that, Jones stayed away from the [Petitioner] and even moved without letting anyone know where she was living because of the [Petitioner]'s threats. Jones also stayed away from the victim "because [she] took heed into what [the Petitioner] had said."

Jones testified that, on February 22, 2008, she was sitting with her cousin, Kendrick Buckley, in Buckley's truck outside her grandmother's house on Hubert Circle waiting for her children to come home from a Mardi Gras celebration at school. She saw the [Petitioner] pull up in his mother's Chrysler Pacifica, get out of the car, and walk up to her grandmother's porch at "[a] fast pace." Alarmed because of the threats the [Petitioner] had made, Jones told Buckley to drive away. Jones called her grandmother to see if the [Petitioner] was in her house, and her grandmother informed her that he was not. A few minutes later, Stephanie Blanton, Jones's grandmother's next-door neighbor, called and told Jones that the victim had been shot and was bleeding to death on her front porch. Jones acknowledged that neither the victim, Torre Smith, nor anyone else was around when the [Petitioner] arrived at Hubert Circle. Later, Jones gave a statement to the police and identified the [Petitioner] in a photographic array as the person she saw at her grandmother's house the night of the murder.

Torre Smith, the victim's cousin, testified that he accompanied the victim to Hubert Circle on February 22, 2008. The victim drove the two of them in Smith's car. The victim stopped in front of a white house, got out, and walked up to the front porch. He knocked on the front door, looked in the window, and then walked to the house next door, all the while talking on his cell phone. As the victim was walking to the house next door, "a car c[a]me speeding up behind [Smith's] car and a gentleman jumped out, running with a pistol and saying, 'I've been waiting to catch you,' and he shot right when he got by [Smith's] window, but he was running and [the victim] took out running." The victim ran behind the houses, and the gunman chased him. Smith moved into the driver's seat and drove down the street to see if he could intercept the victim. However, he heard more gunshots and did not see the victim, so he drove back to the original location in time to see the gunman getting into a Chrysler Pacifica. Smith followed the gunman and got a partial license plate number, which he relayed to 911. Smith drove back to Hubert Circle where he saw the victim lying on the front porch "convulsing." Later, Smith told the police what he had seen, including a description of the gunman, but he was unable to identify the gunman in a photographic array.

Akil Payne testified that he lived on Hubert Circle next door to Jones's grandmother. Payne knew the victim because the victim had dated both Payne's sister, Kimberly Blanton, and Shaka Jones. Payne knew the [Petitioner] as well, who was usually referred to as "V" or a few times as "Lil V." On the evening of February 22, 2008, Payne was in his house with his

stepfather, Rickey Dunlap, when he heard gunshots outside. Payne looked out the window and saw a blue Chrysler Pacifica, which he recognized as the [Petitioner]'s mother's car, parked in front of Jones's grandmother's house. When the shooting stopped, Payne's sister knocked on the door and said that the victim had been shot. Payne opened the door and saw the victim lying on the front porch. Payne knelt down, held the victim in his arms, and asked him what had happened. The victim told him, "V shot me." Payne asked if he meant "Shaka's baby daddy," and the victim confirmed that it was. The victim told him that the [Petitioner] shot him "[o]ver Shaka." The victim said, "I don't think I'm going to make this one" and began praying.

Officer Russell Mooney with the Memphis Police Department testified that he responded to the dispatch call to the scene that evening. When he arrived, he saw the victim lying on the front porch of the house. He called for an ambulance and secured the crime scene. He noticed some shell casings on the ground and pointed them out to the crime scene officers.

Officer Jeffrey Garey with the Memphis Police Department Crime Scene Unit testified that he reported to the Regional Medical Center where he photographed the victim and tagged his property.

Sergeant James Smith with the Memphis Police Department Crime Scene Unit testified that he photographed the crime scene and collected evidence. Among the evidence collected were three spent forty-five caliber shell casings: one on the sidewalk in the front of the house and two near the back porch of the house. He also found a red Samsung cell phone in the grass at the front of the house.

Gwendolyn Motley, the [Petitioner]'s mother, testified that the police came to her house the night of February 22, 2008, looking for the [Petitioner] and asking about her 2005 Chrysler Pacifica. The [Petitioner] had been to her house earlier that evening, but she was not sure where he was when the police arrived. She acknowledged that the [Petitioner] drove her car at times but did not recall whether he had driven it that evening. The car was at her house when the police arrived.

Shelva Stafford of the Shelby County Clerk's Office testified that Tennessee license plate 755NLL was registered to Gwendolyn Motley.

Detective Patrick Parson with the Memphis Police Department testified that, as an officer on the criminal apprehension team, he was one of the officers who went to Gwendolyn Motley's house looking for the [Petitioner] that night. Motley was very nice and responsive and gave Detective Parson consent to search her home, but the [Petitioner] was not in the house. Motley told Detective Parson that the [Petitioner] had driven her Pacifica that day, including when he went to the store around 6:00 p.m. and again around 7:00 p.m. when "he left the house . . . and she had no whereabouts on where he was." She did not know how her vehicle got back in her driveway where it was when the officers arrived.

Sergeant Anthony Mullins with the Memphis Police Department Homicide Bureau testified that he was the case coordinator in this case. Sergeant Mullins interviewed Shaka Jones, Kendrick Buckley, Torre Smith, and Akil Payne. Based on what the witnesses told him, he determined that Jones and Buckley were on Hubert Circle but left when the [Petitioner] arrived. The victim and Smith arrived after Jones and Buckley had gone, and then the [Petitioner] "pull[ed] up after [the victim] g[o]t[ ] out, but they're on opposite sides of the street in different times." Sergeant Mullins did not suspect Jones of having played a role in the murder. He did not request gunshot residue testing on the victim because there was no indication that he had a gun. Sergeant Mullins obtained a warrant for the [Petitioner]'s arrest, but, despite receiving numerous tips, the police were unable to find him until April 2009.

Officer Billy Byrd with the Memphis Police Department's Criminal Apprehension Team testified that he was part of the team that arrested the [Petitioner] at a Microtel Inn in Memphis. The team had to break down the motel room door and the bathroom door to apprehend the [Petitioner].

Dr. Karen Chancellor, chief medical examiner for Shelby County, testified that she performed the autopsy on the victim. Dr. Chancellor observed a gunshot wound to the left side of the victim's body with the bullet still inside the body. The bullet passed through the victim's left kidney, pancreas, and liver and damaged the inferior vena cava, causing the victim to bleed to death internally. She noted that the victim had "some superficial abrasions on the forehead," which she speculated may have been caused when the victim fell after being shot. Dr. Chancellor recovered the bullet from the victim's right chest cavity and tagged it as evidence.

Agent Cervinia Braswell, a firearms examiner for the Tennessee Bureau of Investigation, testified that she examined the ballistics evidence in this case. Agent Braswell determined that the cartridge cases found at the crime scene were all fired from the same firearm. She determined that the bullet recovered from the victim's body was the same caliber as the casings and consistent with the manufacturer of the casings.

After the conclusion of the proof, the jury convicted the [Petitioner], as charged, of first degree premeditated murder.

State v. Vernon Motley, No. W2010-01989-CCA-R3-CD, 2012 WL 1080479, at *1-4 (Tenn. Crim. App. Mar. 29, 2012), perm. app. denied (Tenn. Aug. 16, 2012).

On direct appeal, the Petitioner argued that the trial court erred when it did not grant a mistrial after the State committed a Brady violation by not disclosing Shaka Jones's statement to police until it was disclosed as Jencks material following Jones's testimony at trial. Id. at *6-7. In her statement, Shaka Jones said Stephanie Blanton and Rickey Dunlap informed her that the Petitioner and the victim had gotten into a fistfight and when the victim gave up and stopped fighting, the Petitioner shot him. Id. at *7. In its opinion on direct appeal, this court concluded that the State had "arguably committed a Brady violation by not disclosing evidence of the fight between the victim and [the Petitioner]" but that the failure to disclose this evidence was harmless beyond a reasonable doubt given the "overwhelming" evidence of premeditation. Id. On October 11, 2012, the Petitioner filed a timely post-conviction petition and later filed an amended petition alleging, in part, ineffective assistance of counsel.

**Post-Conviction Hearing.** The Petitioner testified that the first attorney appointed to his case in criminal court was allowed to withdraw after he filed a complaint against him with the Board of Professional Responsibility. His second attorney, who was also appointed, represented him at trial. He said he spoke to trial counsel, who was the lead counsel, only two times prior to trial and spoke to co-counsel, who was an inexperienced attorney, the rest of the time. The Petitioner wrote numerous letters to trial counsel, which were admitted into evidence. In these letters, the Petitioner insisted on pursuing an alibi defense and became angry when trial counsel questioned how he was going to reconcile an alibi defense with the fact that witnesses had seen him in his mother's car at the crime scene and had seen him run into the yard and shoot the victim. The Petitioner asserted that he had three or four alibis for the crime and claimed that trial counsel never provided him with any documents obtained through discovery.

Although he had consistently insisted on an alibi defense in the aforementioned letters, the Petitioner asserted at the post-conviction hearing that he shot the victim in self-defense. He then provided a detailed explanation of what he claimed had occurred. He said he told trial counsel the first time he met him that he had been provoked and had acted in self-defense when he shot the victim, but trial counsel refused to pursue these defense theories. He said trial counsel informed him that in order to present evidence of a fight, he was going to have to testify, which would have disastrous results because the State would cross-examine him about the statements he had made to investigators in the Jesse Dodson murder case and would cross-examine him about his brother's prior criminal case. The Petitioner said that at the beginning of trial he intended to testify but that trial counsel later told him it would not be in his best interest to testify, and he gave up taking the stand to present evidence of the fight.

Prior to trial, when trial counsel presented several defense theories to which he could not agree, the Petitioner suggested that the defense strategy should be to make the State prove its case and say nothing at all. He said that trial counsel should not have mentioned during his opening statement that he anticipated the Petitioner would testify that he was not present at the time of the crime because the proof, including Shaka Jones's statement to police that was the subject of the <u>Brady</u> violation, showed that he was present at the scene of the crime. The Petitioner also claimed that he had wanted to testify at trial, even though he clearly stated during his <u>Momon</u> hearing that he did not wish to testify.

Gwendolyn Motley, the Petitioner's mother, testified that the Petitioner had wanted to testify at trial.

Tara Motley, the Petitioner's sister, testified that she typed the Petitioner's letters to trial counsel from the Petitioner's handwritten letters. She also stated that the Petitioner had intended to testify at trial.

Trial counsel testified that he had been licensed in Tennessee for thirteen years. He said that at the time of the Petitioner's case, he had handled forty first degree murder cases and was certified as a criminal trial expert in Tennessee and Arkansas. Trial counsel stated that he was the primary attorney working on the Petitioner's case and that co-counsel, an associate at his firm, assisted him with the case even though co-counsel was not separately appointed to represent the Petitioner. He also stated that his investigator assisted him with the Petitioner's case. Trial counsel said that because he knew of the Petitioner's complaints about his first attorney, he responded promptly to each of the Petitioner's many letters to him. He also met with the Petitioner at each monthly report date and gave the Petitioner everything "pertinent, important, material" regarding his case.

Trial counsel stated that the Petitioner, almost immediately, wanted him to file a notice of alibi and never told him that he was present when the victim was shot. He said he was "shocked" that the Petitioner had just testified that he told trial counsel he was present at the crime scene. Trial counsel asserted that he and the Petitioner discussed whether the Petitioner would testify and discussed possible defenses that could be raised on his behalf. He also stated that they discussed whether a self-defense argument would be in the Petitioner's best interest:

> [The Petitioner] had discussed the issue of self-defense. I–again, we discussed whether or not the facts and evidence that I believed would come out at trial would support the charging of self-defense from the Court, and/or worst-case scenario, if the Court did charge that, what the requirements to meet . . . [the] self-defense definition would be, and how you've taken a case in which you may be able to argue for a lesser-included [offense] and made it a . . . "all or none" case. If you argue self-defense, you're saying, "Yes, I did it. I killed him, but I was justified in doing it." You're kind of . . . asking the jury to say . . . [e]ither yes, it was self-defense, or no, it's first-degree.

> You can–and I do it on the right cases. I do it where I will argue self-defense, hoping that some of the jurors will have a strong feeling [about] that, others may not, and eventually, they'll . . . find the right verdict and come back with a lesser-included.

> But in this case, because of the–what I believed the facts at trial to be, asking for a self-defense instruction I thought would have been very damaging to the case and expressed that to [the Petitioner].

Trial counsel said that even though the Petitioner had not told him he was present at the scene, he knew that the State's witnesses "were going to testify that he jumped out of the car, saying, 'There you are, I've been looking for you,' and ran off and engaged the soon-to-be victim . . . and under self-defense, you kind of can't be the initial aggressor." Trial counsel stated that he would have liked to have had Shaka Jones's statement to police because it would have been one more thing to justify arguing that the Petitioner was guilty of only a lesser included offense:

> The Court of Criminal Appeals found that [the State's failure to disclose Shaka Jones's statement to police] was a <u>Brady</u> violation; it just was harmless. We didn't have or were not provided names of those witnesses until days before trial, maybe a–maybe a week, week and a half, with no indication of who they were. They obviously weren't on the indictment. They . . . were not provided

to us in discovery, because in this case, as the State has a right to do under Rule 16, they did not provide . . . trial witness statements, <u>Jencks</u> material, if you will. However, the review of the <u>Jencks</u> material, in my opinion, and I think the Court of Appeals said, also, that it contained <u>Brady</u> material, and that was not provided to us.

[The Petitioner] had always contended that he was not there and that we were just going to sit there and listen to the evidence and not do anything. And so because of that–I would have preferred, I would have liked, as a trial attorney, to have had that information because then it would have been one more thing I could have shown [the Petitioner] to justify what I felt was in his best interest, which was to argue for voluntary manslaughter or a lesser-included, a provocation case.

Trial counsel said the Petitioner informed him that if he argued any defense other than an alibi defense, he would take the stand and testify that he was not present at the time of the offense:

[I]n those days and weeks leading up to trial, [the Petitioner] instructed us not to run any defense other than he was not there and that if we did anything other than he wasn't there, he was going to take the stand and . . . undermine our entire case . . . .

But when your client's sitting there telling you he's about to undermine everything you're about to do, it's hard to . . . go in and argue to a jury, with any hopes of success, that he was there, and . . . it was provocation, . . . and it wasn't meant to be a killing and then your client come[s] back and testif[ies] that he wasn't there [when the crime was committed].

. . . [W]e felt that there was no chance of winning if we didn't adopt his strategy. It was an absolute train wreck if we didn't. There was no way–we spent many, many days with him trying to talk him out of it. Even throughout trial, trying to talk him out of that, even up to the point of right before we started trial, [we] thought we could talk him out of it. And then it wasn't until the opening–and I had to get up and just make the call whether I was going with the opening we had [regarding the Petitioner's guilt of a lesser included offense] or changing on the fly [to] say he wasn't there, and . . . that's why the opening is he wasn't there. . . . [T]he defense that was appropriate to this case that I felt was in my client's best interest, my client . . . was going to undermine it, and I just–I had no choice.

Trial counsel also stated that he talked to the Petitioner "about his decision to testify, the impact of his decision, how the jury would see it, how it would impact his trial, the pros and cons, strategy, negatives, positives–more than I have talked to any other client I have ever tried, ever. Probably combined." He stated that the Petitioner made a voluntary decision not to testify.

Trial counsel admitted that if the State had turned over Shaka Jones's statement to police in a more timely fashion, he might have been able to persuade the Petitioner to pursue a defense strategy other than an alibi:

> [Shaka Jones's statement to police] backed up everything that we had been telling him the entire time we were preparing for trial. It backed up what we told him that we believed, that no matter what trial, somewhere in this trial, we're going to find a Brady error. Didn't expect one that big. And it went directly to the issues we were having with client control.
>
> And when I say, "client control," I mean convincing the client that we, A, know what we're talking about; B, have done this and have been around the block a couple of times; and C, know how to try a case. It backed up . . . the very things that we had been saying to him and would have fit perfectly with the defense strategy that [co-counsel] and I had developed and spent weeks trying to–probably really months because it started from the very beginning, but once . . . all the investigation was done, we were preparing for the case and having long sit-downs with him, it was the defense.
>
> . . . It was . . . after that when we got the . . . Jencks material [regarding Shaka Jones's statement to police], took it back and were able to show [the Petitioner], "Look. Here . . . it is on paper. We told you this is what you should have done." Then he said, "Oh, yeah, I guess you were right."

Trial counsel said that by the time he received Jones's statement to police as Jencks material, he felt his hands were tied because he had already told the jury in his opening statement that the evidence was going to show the Petitioner was not present at the time of the victim's death. He said his opening and closing arguments were completely different because in the opening he argued that the Petitioner was not present at the time of the crime and in his closing he argued that the Petitioner shot the victim during a fight. Trial counsel said that if he had known about the Brady material, his opening and closing statements would have argued that the Petitioner killed the victim during a fight and was only guilty of a lesser included offense. However, trial counsel denied that the Brady violation made it impossible to be effective in advising the Petitioner regarding trial strategy:

-10-

I can't say that [the <u>Brady</u> violation made it impossible for me to be effective in advising the Petitioner about trial strategy] because it didn't change my advice. I think it would have given me one extra tool in convincing him, but my advice was the same all the way through. . . . I mean, I had the discovery, I had my theme theory, I had the idea what had happened, I just didn't have that little bit of plus which was, "Oh, by the way, sure enough, there are witnesses out there who were available–who possibly would have said, if we'd had them timely, to say that there was a scuffle beforehand." And that's all [Jones's statement said was] there was a scuffle.

Trial counsel stated that even though he wanted to pursue the lesser included offense theory, the Petitioner insisted that he was not present at the scene. He acknowledged that there were no eyewitnesses, other than the victim, who could positively identify the Petitioner as the shooter at trial, although there were witnesses who placed him at the scene and there was the victim's dying declaration that identified the Petitioner as the shooter. Trial counsel said the Petitioner wanted him to locate "Frayser Boy" to support his alibi and to not cross-examine any of the State's witnesses because he believed that none of them could identify him as the shooter.

Co-counsel testified that he had been licensed a little over a year at the time of the Petitioner's trial. He said that he had trial experience and had handled second degree murder cases at that time but that the Petitioner's case might have been the first first degree murder case he handled. Co-counsel stated that the evidence, including the medical evidence, showed that the victim had been involved in a fist fight. The evidence also showed that the Petitioner was present at the crime scene, which meant that an alibi defense would not have been effective at trial. Co-counsel believed that the Petitioner was so insistent on an alibi defense because he was suspicious of the judicial system and was nervous about admitting he had been present at the scene. He said the defense team could not risk presenting a lesser included offense theory or a self-defense theory and then have the Petitioner testify that he was not present when the victim died.

At the end of the evidentiary hearing, the post-conviction court denied relief and later entered a written order to that effect. In its extensive oral findings, the court determined that the Petitioner was "the engineer of his own demise" because he insisted on an alibi defense even though trial counsel and co-counsel had repeatedly advised him that a self-defense theory or a lesser included offense theory, which were sound defense strategies, would have been more effective. The court found that the Petitioner told counsel if they even suggested that he was present at the crime scene, he would sabotage his defense by taking the stand and telling the jury that he was not present when the crime occurred. It further found that because of the Petitioner's insistence on an alibi defense, trial counsel argued in his opening

statement that the Petitioner was not present at the time of the crime and that he anticipated that the Petitioner would testify that he was not present when the victim was shot. The court added that counsel were not ineffective in presenting one defense theory in opening statement and then changing that theory during trial as the case evolved. Moreover, the court determined that it was the Petitioner's decision not to testify at trial and that his testimony to the contrary was not credible. The court also found that the Petitioner never admitted that he had fought with the victim until Shaka Jones's statement to the police was disclosed at trial. It emphasized that the proof of the Petitioner's guilt in this case was overwhelming. Ultimately, the court held the Petitioner failed to establish that counsels' performance was deficient or prejudicial, asserting that "not only did [the Petitioner] receive effective representation, he received outstanding representation on a case that was absolutely indefensible."

## ANALYSIS

The Petitioner argues that "the State's Brady violation [regarding Shaka Jones's statement to the police] interfered with the attorney-client relationship" by preventing trial counsel from advising him about a defense strategy based upon self-defense or a lesser included offense, which negatively affected the outcome of trial. He claims that because he was not receptive to a defense theory that involved him struggling with the victim until after he was shown Jones's statement, the State's Brady violation kept him from testifying that the victim confronted him prior to the fight and prevented the defense from "present[ing] an emotional case to the jury that allowed them to understand how a person could come to kill another person." The Petitioner asserts that had the State's Brady violation not rendered counsel's assistance ineffective, the jury likely would have acquitted him of all charges or found him guilty of a lesser included offense. To buttress this argument, he asserts that he was distrustful of the criminal justice system, he did not have an attorney of his choosing but was appointed counsel, and he did not understand that an alibi theory and a self-defense theory conflicted with one another. He also claims that he did not understand the significance of circumstantial evidence, erroneously believed he could not be convicted without an eyewitness identification, and did not understand a defense theory that placed him at the crime scene. We conclude that the Petitioner is not entitled to relief.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover,

> factual questions involving the credibility of witnesses or the weight of their
> testimony are matters for the trial court to resolve. The appellate court's
> review of a legal issue, or of a mixed question of law or fact such as a claim
> of ineffective assistance of counsel, is de novo with no presumption of
> correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted); see Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Vaughn, 202 S.W.3d at 115 (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010) (citing Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009)).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel
> is guaranteed by both the Sixth Amendment to the United States Constitution
> and article I, section 9, of the Tennessee Constitution. Both the United States
> Supreme Court and this Court have recognized that this right to representation
> encompasses the right to reasonably effective assistance, that is, within the
> range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotations and citations omitted). "Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." Strickland v. Washington, 466 U.S. 668, 686 (1984) (citing Geders v. United States, 425 U.S. 80, 88-91 (1976) (trial court's order prevented the defendant from consulting with his attorney during an overnight recess); Herring v. New York, 422 U.S. 853, 858-65 (1975) (statute allowed trial courts to deny defense counsel the opportunity to make a closing argument during bench trial); Brooks v. Tennessee, 406 U.S. 605, 612-13 (1972) (statute required defendants desiring to testify to be first defense witness); Ferguson v. Georgia, 365 U.S. 570, 593-96 (1961) (defendant denied the right to have his attorney question him to elicit his unsworn statement pursuant to statute making defendants incompetent to testify under oath on their own behalf)). Certain types of state interference with counsel's assistance are presumed to be prejudicial because they "involve impairments of the Sixth Amendment right [to effective assistance of counsel] that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent." Id. at 692; see State

v. Timothy Tereze Dewalt, No. W2001-00168-CCA-R3-CD, 2002 WL 1482722, at \*2 (Tenn. Crim. App. Feb. 4, 2002).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 687; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

The Petitioner essentially argues that the State's Brady violation rendered counsel's assistance ineffective because it prevented counsel from advising him about a defense strategy based upon self-defense or a lesser included offense. "The effective assistance of counsel necessarily requires counsel to 'conduct appropriate investigations, both factual and legal,' and to assert defenses 'in a proper and timely manner.'" Wiley, 183 S.W.3d at 331-32 (quoting Baxter, 523 S.W.2d at 932, 935). However, a defendant's statements to counsel should be considered in determining whether counsel performance is deficient:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as

-14-

unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Strickland, 466 U.S. at 691 (citation omitted).

"In evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. However, this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

The evidences does not preponderate against the extensive findings of fact made by the post-conviction court. The Petitioner was not denied effective assistance of counsel by an act of the trial court or the State. See Timothy Tereze Dewalt, 2002 WL 1482722, at *3. Counsel properly investigated the Petitioner's case, informed him of possible defenses, and adequately prepared for trial. Counsel and the Petitioner were aware prior to trial that the State would present evidence that the Petitioner was at the crime scene, had previously made threats against the victim, and had been identified as the shooter by the victim in a dying declaration. Despite knowing about this evidence, the Petitioner never admitted to trial counsel that he was present at the scene of the crime and insisted on pursuing an alibi defense, even though his attorneys believed that a lesser included offense strategy would have been more effective. Moreover, the Petitioner told trial counsel and co-counsel that if they tried to present a defense theory other than alibi at trial, he would take the stand and testify that he was not present when the crime occurred, thereby sabotaging his own defense. The Petitioner's insistence, at all costs, on pursuing an alibi defense effectively tied counsels' hands, resulting in an opening statement that argued the alibi defense and indicated that the Petitioner would testify he was not present when the crime occurred and a closing statement, following the admission of Shaka Jones's statement to police, that argued the Petitioner was only guilty of a lesser included offense because he killed the victim during a fight. Compare King v. State, 989 S.W.2d 319, 331-32 (Tenn. 1999) (concluding that trial counsel's decision to change trial strategy in response to surprise testimony, which was admitted over his objection, did not constitute ineffective assistance), with State v. Zimmerman, 823 S.W.2d 220, 224 (Tenn. Crim. App. 1991) (holding that trial counsel's sudden and unjustified

"abandonment of the pre-established and reasonably sound defense strategy" was deficient).

Although the Petitioner claims that the State's <u>Brady</u> violation prevented him from taking the stand to testify in his own defense, we conclude that the Petitioner's decision not to testify following the admission of Jones's statement to police was a voluntary one, necessitated by his insistence on an alibi defense, and not the result of ineffective assistance of counsel. <u>Cf.</u> <u>Zimmerman</u>, 823 S.W.2d at 228 (concluding that trial counsel's recommendation to defendant not to testify after counsel had commented in its opening statement that the jury would hear from the defendant was deficient because nothing occurred at trial requiring an "an abrupt change of strategy"). The <u>Brady</u> violation did not render counsels' assistance ineffective because trial counsel and co-counsel had advised the Petitioner to pursue a lesser included offense strategy from the very beginning of the case based on the evidence they had received. The fact that the Petitioner could not be convinced as to the most effective defense strategy prior to trial does not make counsels' performance deficient or prejudicial, particularly in light of the overwhelming evidence of premeditation. Because the Petitioner has failed to establish that the State's <u>Brady</u> violation rendered counsels' performance ineffective, he is not entitled to relief.

## CONCLUSION

The Petitioner has failed to establish that he received ineffective assistance of counsel. Accordingly, the judgment denying post-conviction relief is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE

-16-